**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
OCTOBER 24, 2024

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED FOR
RECORD AT 8 A.M. ON
OCTOBER 24, 2024

SARAH R. PENDLETON
ACTING SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

          Petitioner,

    v.

MALCOLM OTHA MCGEE,

          Respondent.

No. 102134-8

EN BANC

Filed: October 24, 2024

STEPHENS, J.— In keeping with the strong privacy protections recognized in article I, section 7 of the Washington State Constitution, this court has developed a rigorous exclusionary rule to prevent the use of evidence obtained in violation of privacy rights. Describing our exclusionary rule as "nearly categorical," *State v. Winterstein*, 167 Wn.2d 620, 636, 220 P.3d 1226 (2009), we have allowed only narrow exceptions, one of which is the attenuation doctrine, at issue in this case. *See State v. Mayfield*, 192 Wn.2d 871, 434 P.3d 58 (2019). Today, we are asked whether our attenuation doctrine allows police to apply for a warrant using tainted evidence when a new circumstance—here, an independent criminal act—lends new

significance to the knowledge they gained from that evidence. Our answer is no, as a new reason for seeking to use tainted evidence does not dissipate the taint. We affirm the Court of Appeals order vacating McGee's conviction and remanding for a new trial.

BACKGROUND AND PROCEDURAL HISTORY

On June 3, 2017, King County Sheriff's Office (KCSO) Deputy Alexander Hawley saw a man get into the passenger seat of a silver Chrysler Sebring with tinted windows outside the Boulevard Park Library in Burien. The car drove less than a block, stopped, and the passenger exited the vehicle, appearing to place something small in his pocket. Suspecting a drug transaction had occurred, Hawley followed and stopped the vehicle. From this stop—later ruled illegal—Hawley obtained the identity of the driver, Malcolm Otha McGee, and McGee's phone number and seized drugs and items associated with selling drugs. In questioning McGee during the stop, Hawley learned that McGee and the man seen exiting the vehicle (later identified as Keith Ayson) had a drug dealing relationship—McGee claimed Ayson was his dealer. Hawley offered to refrain from referring a violation of the Uniform Controlled Substances Act (VUCSA), ch. 69.50 RCW, charge against McGee if he signed a confidential informant (CI) agreement, and McGee agreed. Deputy Hawley gave McGee his phone number but never heard back from him.

Hawley then returned to the area where he had seen the passenger exit the car, and he found Ayson sitting behind a laundromat near the library. Hawley told Ayson about his conversation with McGee, and Ayson flatly denied being a drug dealer. He said McGee was his dealer, and he had been regularly buying crack cocaine and marijuana from McGee for the two months he had known him. Ayson named his dealer "TJ," but when Hawley showed Ayson a recent booking photo of McGee, Ayson confirmed McGee was the person he knew as "TJ." Hawley concluded McGee had fabricated the story about Ayson being McGee's dealer and recorded the details of his interactions with McGee and Ayson in a police report.

The next day, June 4, 2017, a 911 caller reported hearing gunfire near his house, which was located on a dead-end street next to a forested creek bed. The caller said he and a friend saw a parked car he believed was a silver-gray 2000 Chrysler with tinted windows and two black men they did not recognize walking toward the dead-end. Sometime later he heard gunshots and then saw the car drive away. Police investigated and found nothing that day.[1] On July 11, 2017, the same 911 caller reported finding a decomposing body in the forested area. The body was identified as Ayson, who appeared to have been shot multiple times. Police

---

[1] The record shows some inconsistencies between the witness reports provided by the caller and his friend concerning the age and color of the car, the apparent race of the two men they saw walking down the street, and how much time elapsed between seeing the men and hearing gunfire. We acknowledge these inconsistencies, but we do not find them material to the issue before us.

recovered a cell phone from Ayson's body and obtained a warrant to search the phone. The investigating KCSO detective, Michael Glasgow, was unable to power on the device or obtain any information other than its phone number on the SIM (subscriber identity module) card.

Police searched Ayson's name in their database to determine whether he had any known associations and found Deputy Hawley's report from the June 3 narcotics investigation. From this, detectives identified McGee as a potential suspect. On July 12, 2017, Detective Glasgow called Deputy Hawley to confirm the information in his report, including McGee's phone number. To further verify the connection between McGee and the phone number listed in the report, Detective Glasgow researched the number in two places: on Facebook, where he entered the number in the "Find Friends" function and learned it was associated with a user profile that appeared to belong to McGee, and in the law enforcement database, which turned up an earlier police report, dated March 3, 2017, from a prior interaction between McGee and law enforcement.

Detective Glasgow applied for a warrant to obtain phone records from Ayson's cell provider. Specifically, the warrant application sought subscriber information, device identifying information, usage information, GPS (global positioning system) data, connection logs and records, the physical addresses of cellular towers to which the phone had connected, and stored information such as

voicemail and text messages. In the same warrant application, police sought records for the phone number associated with McGee. This warrant application relied heavily on the evidence from Deputy Hawley's illegal stop to establish probable cause: specifically, that he pulled over McGee while McGee was driving a silver Chrysler Sebring with tinted windows—which roughly fit the description the 911 caller gave—and, most critically, that McGee and Ayson each told Deputy Hawley that they knew the other in the context of a drug dealing relationship. From McGee's phone records, police hoped to discover McGee's whereabouts at the time the 911 caller reported hearing gunshots, and to possibly establish his motive for the murder "considering that Ayson had pointed the finger at McGee as the drug dealer." Clerk's Papers (CP) at 361-66. This warrant issued on July 13, 2017.

Records from McGee's phone obtained with the July 13 warrant showed two calls received from Ayson's phone on June 4: one at 3:20 PM and another at 3:43 PM. During the second call, both phones connected to the same cell tower, which police believed meant that McGee and Ayson were near each other. This was the last call showing on Ayson's phone until June 8, 2017, when the records showed several missed calls. It was also the last call in McGee's phone records prior to the time the 911 caller reported hearing shots fired. After that, McGee's phone placed and received several calls that connected to cell towers covering the general area where

Ayson's body was later discovered. Police also noticed a clustering of activity (37 calls) in McGee's phone records within 108 minutes of the "shots fired" 911 call.

The remainder of the investigation relied heavily on this evidence obtained from the June 3 stop and the July 13 warrant. Police used the evidence to obtain additional warrants for provider records of phone numbers dialed from or received by McGee's phone around the time gunfire was reported and to search McGee's cell phone, his ex-girlfriend's apartment, the Chrysler Sebring, and a Cadillac Seville associated with McGee. The evidence was also used in warrant applications for searches of a phone belonging to McGee's ex-girlfriend that was seized from her apartment and of another vehicle associated with McGee (a white 1997 Geo Prizm), and to obtain additional provider records associated with McGee's phone.

On August 1, 2017, police arrested McGee on probable cause for murder and on a warrant for VUCSA stemming from the June 3, 2017 arrest. They did not immediately tell McGee he was a suspect in a homicide investigation in addition to being arrested on a drug charge. During the ride to the station, McGee stated that he had not called Deputy Hawley back about their CI agreement because the person he was intending to provide information about had been murdered. During a subsequent interview, McGee admitted to speaking with Ayson on June 4, 2017, but denied meeting him in person that day. When confronted with the cell site location data police had obtained from his wireless provider, McGee fell silent and invoked

his right to counsel. The State filed both VUCSA and murder charges against McGee on August 4, 2017.

Before trial, McGee moved to suppress physical evidence as well as his statements, challenging the lawfulness of the June 3 stop. The trial court ruled that Deputy Hawley lacked reasonable suspicion to stop McGee and that the resulting arrest and seizure of drugs from his person was illegal. The State did not challenge this ruling and agreed that suppression would defeat the VUCSA charge, which the court dismissed before trial. However, the State asked the court to clarify whether the facts and circumstances culminating in McGee's later arrest would be admissible to establish McGee's motive to kill Ayson. The trial court ruled that the State could mention McGee and Ayson's "drug dealing relationship" in its opening statement and explain its theory that McGee had killed Ayson because he suspected Ayson was a "snitch." 6 Verbatim Rep. of Proc. (July 31, 2019) at 578-80. The court also granted the State's motion to introduce evidence of the June 3 stop and McGee's statements to Hawley—but not of the drugs seized as a result—to substantiate its argument as to McGee's motive.

At the end of a 10-day trial, the jury could not arrive at a unanimous verdict, and on August 21, 2019, the court declared a mistrial.

A second trial commenced in early 2021. Before this trial, McGee moved to suppress evidence obtained pursuant to the July 13, July 28, August 1, and August 3 warrants. McGee relied on the exclusionary rule under our state constitution and claimed the application for the July 13 warrant used evidence obtained from the illegal June 3 stop—McGee's identity, phone number, connection to the silver Chrysler Sebring, and drug dealing relationship with Ayson. Without this evidence, McGee argued, the July 13 warrant application failed to establish probable cause to obtain his phone records or the positioning data gleaned from those records. He emphasized that the June 3 stop was the tainted source of his cell phone number, central to this warrant application. Because the application, after backing out the tainted evidence, failed to demonstrate probable cause, McGee argued all records obtained from the warrant should be suppressed. And because later warrants built on the evidence obtained from the July 13 warrant, McGee argued all evidence obtained from those warrants should likewise be suppressed.

In an oral ruling, the trial court denied McGee's motion to suppress, finding that suppression of the drug evidence and dismissal of the VUCSA charge remedied any violation of his privacy. The court reasoned that several pieces of evidence in the July 13 warrant application were, by virtue of attenuation or an independent source, not tainted by the illegal stop on June 3, and held that this evidence was independently sufficient to establish probable cause to search McGee's phone

8

records.    Specifically, the judge ruled that the police report from March 2017 provided an independent, untainted source from which police had learned McGee's phone number, and that the discovery of Ayson's body and his cell phone—plus the data mined from that phone, including a call to the phone number associated with McGee around the time gunfire was reported—was the result of investigative efforts entirely unrelated to the June 3 arrest.    Further, the court noted that Ayson's girlfriend had told police about Ayson and McGee's relationship and supplied an independent source of information supporting the State's theory of motive.

On April 24, 2021, the jury returned a guilty verdict on the charge of second-degree murder.  The court sentenced McGee to 298 months, plus a 60-month firearm enhancement.

McGee appealed, arguing, inter alia, that the July 13 warrant relied on evidence that should have been suppressed as fruit of the poisonous tree and that the trial court misapplied our state's attenuation doctrine.  The Court of Appeals agreed, holding the June 3 discovery of McGee's name, his phone number, his stated reasons for associating with Ayson, and his possession of drugs and drug paraphernalia should all have been suppressed. *State v. McGee*, 26 Wn. App. 2d 849, 530 P.3d 211 (2023).  And because each subsequent search warrant relied on this evidence to establish probable cause, the court held it was necessary to suppress the evidence uncovered from those warrants, as well as the statements McGee made to police

following his August 1, 2017 arrest. Accordingly, the Court of Appeals reversed McGee's conviction and remanded for a new trial. We granted the State's petition for review.

## ANALYSIS

Individuals enjoy a fundamental right under both the United States Constitution and our Washington State Constitution to be free from unlawful searches and seizures. *See* U.S. CONST. amend. IV; WASH. CONST. art. I, § 7. But we know unlawful searches and arrests happen notwithstanding the protections called out in our founding documents, raising the question of how individuals may vindicate their rights in the wake of violations, and when, if ever, illegally obtained evidence may be used against them. The exclusionary rule developed through case law provides a partial answer to these questions.

In *Weeks v. United* States, 232 U.S. 383, 393, 34 S. Ct. 341, 58 L. Ed. 652 (1914), the United States Supreme Court reasoned that if the state could keep and use illegally seized evidence—private letters, in that case—against a citizen accused of an offense, the protection of the Fourth Amendment "[would be] of no value, and . . . might as well be stricken from the Constitution." Thus, as a general rule, an individual's privacy rights are vindicated by excluding from court proceedings any evidence obtained in violation of those rights. While the remedy must be meaningful, both the United States Supreme Court, interpreting the Fourth

Amendment, and this court, interpreting article I, section 7, have recognized instances where the suppression of evidence is unwarranted despite the presence of a privacy violation and have crafted limited exceptions. As will be explained, we recognize fewer exceptions under article I, section 7 than can be found in Fourth Amendment jurisprudence; and for attenuation—an exception recognized under both federal and Washington law—we have construed our exception more narrowly.

Article I, section 7 of the Washington State Constitution dictates that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." We have long recognized this provision is more protective of individual privacy than the Fourth Amendment to the United States Constitution, and textual and historical differences have led this court to recognize article I, section 7 demands a less compromising exclusionary rule than its federal counterpart. *See Mayfield*, 192 Wn.2d at 883-89 (mapping the divergence of federal and state jurisprudence in the application of their respective exclusionary rules). Specifically, the federal exclusionary rule allows for the use of illegally obtained evidence where the prejudice of excluding ill-gotten evidence outweighs the deterrent effect exclusion would have on future police misconduct. In contrast, our state exclusionary rule is primarily concerned with remedying privacy violations irrespective of any deterrent value. *See id.* As such, "[o]ur state exclusionary rule requires the suppression of evidence obtained in violation of article I, section 7, with

11

no exceptions that rely on speculation, the likelihood of deterrence, or the reasonableness of official misconduct." *Id.* at 888. *See generally* Justice Charles W. Johnson & Justice Debra L. Stephens, *Survey of Washington Search and Seizure Law: 2019 Update*, 42 SEATTLE UNIV. L. REV. 1277, 1455 (2019) (explaining that federal exclusionary rule focuses on deterring improper police conduct while Washington's rule focuses on protecting privacy).

Recognizing this distinction, our court has rejected any "good faith exception" as well as the speculative notion of "inevitable discovery." *See State v. Afana,* 169 Wn.2d 169, 179-84, 233 P.3d 879 (2010) (rejecting the good faith exception); *Winterstein,* 167 Wn.2d at 631-36 (rejecting the inevitable discovery doctrine). To date, we have formally recognized only two exceptions to our state exclusionary rule: the independent source doctrine and the attenuation doctrine. *State v. Gaines*, 154 Wn.2d 711, 116 P.3d 993 (2005) (recognizing the independent source exception); *Mayfield*, 192 Wn.2d 871 (recognizing the attenuation doctrine, albeit in a narrower form than the federal rule). We have previously described the independent source doctrine as follows: "evidence tainted by unlawful governmental action is not subject to suppression under the exclusionary rule, provided that it ultimately is obtained pursuant to a valid warrant or other lawful means independent of the unlawful action." *Gaines*, 154 Wn.2d at 718. The fact that some knowledge probative of the defendant's guilt was obtained illegally does not render that

underlying fact "sacred and inaccessible." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S. Ct. 182, 64 L. Ed. 319 (1920). Applying this rule in *Gaines*, we upheld the seizure of an assault rifle and other incriminating evidence from the trunk of a defendant's car despite police having previously seen the rifle during an unlawful search of the trunk and including this fact in their warrant application. We reached this conclusion upon finding the affidavit in support of the warrant contained enough evidence obtained independent of the illegal search to give rise to probable cause. Stated differently, the warrant application was sufficient even after "backing out" the tainted evidence.

The attenuation doctrine operates differently. This doctrine reflects a compromise of sorts, recognizing that even where an illegal search or seizure plays some causal role in the discovery of evidence—meaning it was not derived in a manner strictly independent of the illegality—the connection between the illegality and the discovery of the evidence may be "so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939); *Mayfield*, 192 Wn.2d 871. Stated in terms of causation analysis, while misconduct may be a "but for" cause of the discovery of evidence, it may not be a proximate cause. *Mayfield*, 192 Wn.2d at 882 ("[t]he underlying purpose of the attenuation doctrine is to prevent the exclusionary rule from operating on a 'but for' basis"). In this case, the State relies solely on the attenuation doctrine, having abandoned the

13

independent source rationale articulated in the trial court's ruling. *See* Pet. for Rev. at 3.

Our state's attenuation doctrine is narrowly construed consistent with the strong privacy protections in article I, section 7. Whereas federal courts "'attempt[] to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost,'" we require the State to prove a superseding cause truly severed the chain of causation. *Mayfield*, 192 Wn.2d at 892-93 (quoting *Brown v. Illinois*, 422 U.S. 590, 609, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (Powell, J., concurring in part)). In defining "superseding cause," we have imported the meaning given to that phrase in tort law—an "unforeseeable intervening circumstance[] [that] genuinely sever[s] the chain of causation between official misconduct and the discovery of evidence," giving law enforcement a new, legal basis upon which to conduct their search or seizure. *Id.*

The question presented here concerns how to apply this test in the wake of a new, independent criminal act. The State asks us to hold that the attenuating or superseding event may occur *after* the discovery of the evidence, so that it relates to the use of the evidence in a warrant application as part of a new investigation. McGee and amicus argue allowing such use would encourage illegal searches and would disproportionately harm BIPOC (Black, Indigenous, People of Color)

14

individuals, who experience police searches and seizures at disproportionately higher rates than white individuals compared to their relative shares of the population. Br. of Amici Curiae WACDL (Wash. Ass'n of Crim. Def. Lawyers) et al. as Amici Curiae at 10-16 (Br. of Amici); *Chong Yim v. City of Seattle*, 63 F.4th 783, 788 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024)

We agree with the Court of Appeals that the State's argument is inconsistent with our attenuation doctrine and poses too great a risk to individual privacy.

1.  The Court of Appeals correctly applied Washington's attenuation doctrine to require that the superseding event occur between the governmental misconduct and the discovery of the evidence to be used

A superseding cause dissipates the taint of unlawfully seized evidence and may take the form of an independent act of free will by someone other than law enforcement, including by the defendant. *See State v. Rousseau*, 40 Wn.2d 92, 95-96, 241 P.2d 447 (1952) (holding that defendant pushing an officer into the path of an oncoming car after being illegally detained gave the officer a new legal basis to arrest the defendant and conduct a search), *overruled on other ground by State v. Valentine*, 132 Wn.2d 1, 935 P.2d 1294 (1997); *State v. Childress*, 35 Wn. App. 314, 317, 666 P.2d 941 (1983) (concluding victim's testimony of sexual involvement with the defendant was sufficiently attenuated from the illegal search when it was obtained through "an act of free will, not coerced by police exploitation of . . .

illegally seized evidence"). *But see Mayfield*, 192 Wn.2d 871 (finding no attenuation where the defendant's consent to search his truck during an illegal seizure was entirely foreseeable and not an independent act of free will); *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (finding it "unreasonable to infer" that defendant's confession made after officers broke into his bedroom was "sufficiently an act of free will to purge the primary taint of the unlawful [arrest]").

The State argues the superseding event need only occur "between unlawful police conduct and the prosecution's use of tainted information." Suppl. Br. of Pet'r at 4. Building upon *Mayfield*'s language analogizing to tort law, the State claims the "injury" the exclusionary rule seeks to remedy is not the unconstitutional act of obtaining evidence but its *use in an investigation. See id.* at 8-9. The State reasons that the discovery of evidence is not integral to attenuation in tort, which instead turns on "whether an intervening act broke 'the causal connection between the defendant's negligence and the plaintiff's injury.'" *Id*. (quoting *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 482, 951 P.2d 749 (1998)). Tracing the link between the tortious act and resulting injury, the State argues Detective Hawley's illegal stop was analogous to a tortious act and the "injury . . . could probably be defined several ways but includes the arrest and charging of McGee for Ayson's murder." *Id.* at 9. Under this tort law formulation, the attenuating event could happen at any point

16

following the illegal detention, so long as it occurred before the fruits of the illegal detention were used to arrest and charge McGee.

The Court of Appeals properly rejected this argument. It interpreted *Mayfield* consistent with the general understanding of the attenuation doctrine as requiring the curative event to occur between the misconduct and the *discovery* of evidence to be used. *McGee*, 26 Wn. App. 2d at 860 ("*Mayfield* is clear, however, that there must be a superseding cause severing the causal connection 'between' the official misconduct and 'the discovery' of the evidence."). The Court of Appeals aptly observed that the State's argument is not actually rooted in the attenuation doctrine but, instead, relies on inevitable discovery, a doctrine this court has expressly disavowed. *Id.* at 861-62 ("The State's argument amounts to an inevitable discovery argument, because, through Ayson's phone records and other evidence, 'the police would have discovered' McGee's identity and connection to Ayson 'notwithstanding the violation of [McGee's] constitutional rights' in the June 3 stop." (alteration in original) (quoting *Winterstein*, 167 Wn.2d at 634)).

*Mayfield* is instructive. There, we recognized that our attenuation doctrine is narrow and requires an unforeseeable intervening event that breaks the causal chain between the police misconduct and the discovery of evidence to be admitted, such that the evidence is deemed the "fruit" of the superseding cause and not of the illegality. Attenuation does not allow for speculation about what would have been

discovered. Moreover, we have been quite clear that our state exclusionary rule is incompatible with any exception that would allow the State to benefit from illegally obtained evidence. *Mayfield*, 192 Wn.2d at 894. The expanded exception the State asks us to recognize would allow it to use illegally obtained evidence so long as the reason to use it was unforeseeable at the time of seizure and developed only after police discovered the relevance of the illegally obtained evidence to an unrelated, serious crime. This extension of the attenuation doctrine is incompatible with our analysis in *Mayfield*, which properly focuses on the individual privacy violation, not the State's reason for the violation. As amici point out, relaxing our exclusionary rule to allow the later use of tainted evidence for a new reason erodes privacy rights and could potentially "encourage police to stop-and-frisk suspects in high volumes, with the goal of generating information in the police database to be used in further investigations of serious crimes." Br. of Amici at 6. While we do not suggest this is the State's intent or goal here, we must consistently interpret our exclusionary rule to focus on safeguarding privacy rights as the paramount concern.

    2. We reject the State's invitation to recenter deterrence in our attenuation analysis

The State acknowledges its argument fails under "a literal reading of *Mayfield*'s statement that any superseding event must sever 'the causal connection 'between' the official misconduct and '*the discovery*' of the evidence.'" Suppl. Br.

18

of Pet'r at 7-8 (boldface omitted) (quoting *Mayfield*, 192 Wn.2d at 895-96). To avoid this result, the State asks us to confine *Mayfield* to more "typical" attenuation fact patterns, where the superseding event occurred before police discovered the evidence to be admitted, and to consider whether "'logic, common sense, justice, policy, and precedent'" compel a different result in the "atypical" scenario in this case. *Id.* at 11 (quoting *Schooley*, 134 Wn.2d at 479). The State also invites us to place the deterrence of police misconduct at the center of our attenuation analysis. In support of this new approach, the State offers examples of foreign cases where the attenuation doctrine was applied to the fruits of illegal searches and seizures that were used in the investigation and prosecution of later, unrelated crimes. *See People v. McInnis*, 6 Cal. 3d 821, 494 P.2d 690 (1972); *People v. Marquez*, 31 Cal. App. 5th 402, 242 Cal. Rptr. 3d 530 (2019); *State v. Booker*, 212 Ariz. 502, 135 P.3d 57 (Ct. App. 2006); *United States v. Turk*, 526 F.2d 654 (5th Cir. 1976). We find the state's reliance on these cases misplaced.

To be sure, we have recognized multiple values supported by our exclusionary rule, including deterrence. In *State v. Bonds*, we said the exclusionary rule should be applied to achieve three objectives:

> [F]irst, and most important, to protect privacy interests of individuals against unreasonable governmental intrusions; second, to deter the police from acting unlawfully in obtaining evidence; and third, to preserve the dignity of the judiciary by refusing to consider evidence which has been obtained through illegal means.

98 Wn.2d 1, 12, 653 P.2d 1024 (1982) (citing *State v. White*, 97 Wn.2d 92, 109-10, 640 P.2d 1061 (1982)).  But we disagree with the State "that suppression in this case would serve no deterrent purpose whatsoever."  Suppl. Br. of Pet'r at 11.  We believe this conclusion fails to account for the broader implications of the State's argument, as recognized by amici.  While it may be true that law enforcement committed no misconduct in need of deterrence by simply recognizing new relevance to the evidence about McGee obtained in Detective Hawley's illegal stop, that is not the full arc of police conduct to be considered.  A rule that would generally allow the use of illegally obtained evidence when the defendant commits a later crime to which that evidence is relevant potentially incentivizes gathering such evidence and keeping it on hand.  *See* Br. of Amici at 9-10.  Stated differently, it fails to deter downstream privacy violations.

The implications of the State's proposed approach rightly give us pause.  The negative impact of allowing such a practice inevitably falls disproportionately on BIPOC individuals, who are stopped, questioned, and searched at far higher rates than non-Hispanic white persons compared to their relative shares of the population.  *Id.* at 11-12; *see also State v. Sum*, 199 Wn.2d 627, 644, 511 P.3d 92 (2022) ("When it comes to police encounters without reasonable suspicion, 'it is no secret that people of color are disproportionate victims of this type of scrutiny.'" (quoting *Utah*

*v. Strieff*, 579 U.S. 232, 254, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016) (Sotomayor, J., dissenting))).

The foreign cases the State relies on do not support expanding our attenuation doctrine by focusing on deterrence as a central rationale. Rather, they are consistent with maintaining our primary focus on individual privacy rights and with our existing exceptions to the exclusionary rule. In *McInnis*, police identified the defendant as the perpetrator of a liquor store robbery by showing a witness a booking photo of the defendant from an illegal detention a month prior. 6 Cal. 3d at 823. The court admitted the witness's identification and the Court of Appeals affirmed the conviction, explaining that "[t]o hold that all such pictures resulting from illegal arrests are inadmissible forever . . . would not merely permit the criminal 'to go free because the constable has blundered' but would . . . in effect be giving [the defendant] a crime insurance policy . . . ." *Id.* at 826 (citation omitted) (quoting *People v. Defore*, 242 N.Y. 13, 21, 150 N.E. 585 (1926)). This result is consistent with the exclusionary rule under article I, section 7. While the photograph would not be admissible, the witness's identification could be considered an independent act of free will and thus admissible.

The situation in *McInnis* is similar to that in *Childress*, 35 Wn. App 314. There, California police had illegally searched the defendant's apartment, obtaining a photograph of two nude girls and a check with an Everett address. 35 Wn. App.

at 315. California police sent the evidence to Everett police, who canvassed the neighborhood around the address on the check. *Id.* This led them to find one of the girls in the photo, and when her parents vaguely asked her if she had been keeping any secrets from them, she voluntarily admitted to having sexual relations with the defendant. *Id.* at 315-16. Although the illegally obtained photo and check were instrumental to the State obtaining the girl's testimony, the Court of Appeals recognized her voluntary identification of the defendant was sufficiently independent of the police misconduct. *Id.* at 316-17.

The State also relies on the California appellate court's holding in *Marquez*, but that case does not support the State's call for an expanded attenuation doctrine. There, police had unlawfully detained the defendant in 2006 and entered his DNA in a police database. 31 Cal. App. 5th at 405. The defendant's DNA later connected him to a robbery committed in 2008, and when police confronted him about it, he agreed to provide another DNA sample. *Id.* The trial court refused to exclude DNA evidence and the Court of Appeals affirmed, noting that Marquez had been arrested three times between 2006 and 2008 and ordered to submit to DNA testing on each occasion (although it seems those orders went unfulfilled). *Id.* at 413. Further, he was on felony probation, the terms of which required him to submit to DNA testing, at the time he consented to the 2008 DNA swab. *Id.* at 407. The Court of Appeals

found these intervening circumstances sufficient to attenuate any taint of the illegal 2006 DNA evidence.

This result aligns with our holding on the independent source doctrine in *State v. Betancourth*, though not precisely with our attenuation doctrine. 190 Wn.2d 357, 413 P.3d 566 (2018). There, we held that the issuance of a second, valid warrant for phone records provided an independent, lawful basis to use the records already in police possession. We said it would be senseless to require police to return and reseize the evidence already seized during an initial, unlawful search and that the evidence should instead be treated as having been "seized" under the second warrant. *Id.* at 364. Importantly, the records at issue in *Betancourth*, like Marquez's DNA, had not changed since police initially obtained them. [2]

In sum, the State does not persuasively show a need to reevaluate our exclusionary rule and elevate the value of deterrence in our attenuation analysis. As we have emphasized before, our exclusionary rule is "nearly categorical,"

---

[2] The consistency between these cases and our exclusionary rule answers the State's complaint that disallowing the evidence from the June 3 stop "would effectively immunize McGee from prosecution in perpetuity even though Detective Hawley's error occurred before the murder was even committed." Suppl. Br. of Pet'r at 19. We disagree with the State that refusing to extend the attenuation doctrine to these circumstances risks making any knowledge gained from an initial illegality " 'sacred and inaccessible.' " *Id.* (quoting *Silverthorne Lumber*, 251 U.S. at 392). Attenuation may apply based on superseding events, and there is also a critical distinction between knowledge and illegally obtained evidence. Nothing in our precedent suggests police must blind themselves to known facts or the inferences drawn from them in order to conduct further investigation following an article I, section, 7 violation. What the State seeks here—and what our attenuation doctrine disallows—is the direct use of the tainted evidence in a warrant application.

*Winterstein*, 167 Wn.2d at 636, and we presume that where a privacy violation has occurred, the remedy must follow.

Here, police undisputedly violated McGee's privacy without authority of law and gained valuable evidence that was recorded in the June 3 police report. The value of this evidence to a murder investigation was not apparent until later, when different officers—themselves blameless for the manner in which the evidence was obtained and apparently unaware they were relying on tainted evidence—parlayed the evidence from the June 3 report into a series of progressively intrusive search warrants. Our attenuation doctrine focuses on remedying the constitutional harm flowing from this use of illegally obtained evidence, regardless of whether we can impute the misconduct of one officer to others who had no role in the illegality or whether they knew the evidence was tainted.

The fact remains that police relied directly on the fruits of the illegal arrest to obtain further warrants, thereby benefiting from the violation of McGee's privacy rights. The State does not demonstrate any superseding event that produced new *evidence* used in the warrant application, only a new *reason* to make the illegally obtained evidence useful. Recognizing the strong privacy protections granted in article I, section 7, we will not extend our narrow attenuation doctrine to such circumstances.

CONCLUSION

The underlying purpose of the attenuation doctrine is to prevent the exclusionary rule from operating on an artificial "but for" basis that potentially excludes lawfully obtained evidence. *Mayfield*, 192 Wn.2d at 882. At the same time, a broadly defined attenuation exception could allow the State to benefit from the fruits of illegal conduct and encroach on individual privacy. *Id.* To prevent the kind of slippage observed in federal attenuation case law, which has eroded the exclusionary rule's protection over time, this court in *Mayfield* limited attenuation to cases where "an unforeseeable intervening act genuinely severs the causal connection between official misconduct and the discovery of evidence." *Id.* at 898. That test is not met here, as the State cannot point to a superseding event that broke the causal chain between McGee's illegal detention and the discovery of evidence relied on in the subsequent search warrant applications. We decline the State's invitation to expand our attenuation doctrine based on new reasons to use illegally obtained evidence.

We affirm the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

_____
Stephens, J.

WE CONCUR:

_____

_____
Gordon McCloud, J.

_____

_____
Yu, J.

_____
Montoya-Lewis, J.

_____
Whitener, J.

26

*State v. McGee (Malcolm Otha)*

No. 102134-8

MADSEN, J. (dissenting)—I write separately to express my concern regarding the broad implications of the majority's unprecedented expansion of the exclusionary rule and specifically its application in this case. Our application of the exclusionary rule, may have "'substantial social costs,' which sometimes include setting the guilty free and the dangerous at large." *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006) (citation omitted) (quoting *United States v. Leon*, 468 U.S. 897, 907, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984)). While we value protecting individual privacy, we should not use our protective rule to unduly obstruct police investigations and impede "the truth-finding functions of judge and jury." *United States v. Payner*, 447 U.S. 727, 734, 100 S. Ct. 2439, 65 L. Ed. 2d 468 (1980).

"The purpose of our state exclusionary rule is to protect individual privacy rights, not to *permanently immunize* suspects from investigation and prosecution." *State v. Mayfield*, 192 Wn.2d 871, 896, 434 P.3d 58 (2019) (emphasis added). For the exclusionary rule to apply, we have held that "there must be some proximate causal connection between the misconduct and the evidence." *Id*. at 889. To avoid application

of the rule using the attenuation doctrine, the causal connection must be "so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939). "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light *but for* the illegal actions of the police." *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (emphasis added). As the majority notes, the exclusionary rule does not apply on a "but for" basis. Majority at 13; *State v. Eserjose*, 171 Wn.2d 907, 922, 259 P.3d 172 (2011) (applying the exclusionary rule on a "but for" basis would "make it virtually impossible to rehabilitate an investigation once misconduct has occurred, granting suspected criminals a permanent immunity unless . . . other law enforcement officers initiate an independent investigation"). Thus, we look for any unforeseen intervening circumstances that sever the chain of causation "'between the defendant's negligence and the plaintiff's injury.'" *Mayfield*, 192 Wn.2d at 892 (quoting *Washburn v. City of Federal Way*, 178 Wn.2d 732, 761, 310 P.3d 1275 (2013)).

Unforeseeable circumstances that often break the chain of causation include later criminal acts. *Washburn*, 178 Wn.2d at 761. Here, it was unforeseeable that Malcolm McGee would commit a later, separate criminal act of murder. The causal connection between the unconstitutional June 3 stop and the cellular phone evidence obtained by the search warrants was broken by Keith Ayson's murder that occurred *five weeks* after the unconstitutional stop. Further, this is not a case of continuing course of conduct. In my view, the exclusionary rule should generally be applied only to evidence in the case in

2

which the unlawful search was conducted, here the violation of the Uniform Controlled

Substances Act (VUCSA), ch. 69.50 RCW, charge, which was directly related to the

unconstitutional stop.

I believe the majority errs in applying the exclusionary rule to a separate case

involving a murder investigation that occurred over a month after the initial stop that was

related to McGee's suspected drug transaction. These are two completely distinct crimes

committed independently, each with different investigating officers, and could have been

tried separately. The State is not seeking to use the evidence obtained against McGee for

the VUCSA charge, which was dismissed after the June 3 stop was deemed

unconstitutional and the drug evidence was suppressed. This case is distinguishable from

cases where the exclusionary rule is applied within the context of a single proceeding.

Although we have emphasized that the Washington exclusionary rule is more

protective than its federal counterpart, Washington's exclusionary rule is born out of the

federal exclusionary rule. We have emphasized that our state rule's purpose is to protect

individual privacy, but once we have determined that a search was unconstitutional under

our state constitution, we have not applied the rule itself differently from the federal

exclusionary rule, which is not typically applied to exclude evidence in separate

proceedings unless the unlawfully obtained evidence is causally connected to the

subsequent proceedings. "Despite its broad deterrent purpose, the exclusionary rule has

never been interpreted to proscribe the use of illegally seized evidence in all proceedings

or against all persons. As with any remedial device, the application of the rule has been

restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974). Here, our objective is to remedy McGee's privacy violation. This has been accomplished by suppressing the drug evidence and dismissing his VUCSA charge. There is no clear demonstration of how the evidence obtained as a result of the unconstitutional stop for the purpose of supporting a VUCSA charge was used to facilitate the discovery of new evidence in the subsequently committed crime here, which is murder.

In both *Wong Sun* and *Mayfield*, the government was seeking to use evidence that had been suppressed *in the same trial*. That is not the case here, where we have two separate cases that were simply joined for convenience. The case relating to the drug possession was dismissed and only the murder case remains. Applying the exclusionary rule to a separate case that has only a tangential relationship to the earlier drug related case is akin to sealing relevant facts and court records. The trial court was correct to suppress evidence of any drugs found and any discussion between McGee and the detective about the drugs. However, the fact of McGee's arrest and detention, the entering into a confidential informant agreement, and who was present at the time of the arrest are facts that should not be excluded; and these are facts relevant to the *murder* investigation, rather than evidence of McGee's initial drug related case, which was properly dismissed.

A factually similar case coming out of Arizona is *State v. Booker*, 212 Ariz. 502, 135 P.3d 57 (Ct. App. 2006). In *Booker*, the police illegally searched a defendant's house and found cannabis paraphernalia: a bong. *Id*. at 503. The trial court ruled that the bong was admissible as evidence of motive in a subsequent trial for aggravated assault and unrelated to the illegal possession of the bong. *Id*. The *Booker* court stated that the assault case did not involve charges related to drug possession and that "[s]uch ancillary application of the exclusionary rule is an extension of the rule's protections beyond its primary use." *Id*. at 505. Although the court analyzed the facts under the Fourth Amendment to the United States Constitution and focused on the deterrent purposes of the exclusionary rule, it looked at the overarching connection between the drug offenses and the aggravating assault, finding no such connection in the record. *Id*. at 507. Here, no proximate cause connects the misconduct to the evidence. The officers could not have possibly known that McGee would later shoot Ayson. Moreover, the evidence of motive would not exist but for the subsequent independent crime occurring. As the trial court found, there was no unconstitutional taint to the later discovered evidence of motive.[1]

---

[1] Although the State relies on the attenuation doctrine here to attempt to uphold the warrant application, an appellate court may affirm a trial court's ruling "on any grounds the record and the law support." *State v. Grier*, 168 Wn. App. 635, 644, 278 P.3d 225 (2012). "[T]he inclusion of illegally obtained information in a warrant affidavit does not render the warrant per se invalid, provided that the affidavit contains facts independent of the illegally obtained information sufficient to give rise to probable cause." *State v. Gaines*, 154 Wn.2d 711, 718, 116 P.3d 993 (2005). Here, the trial judge found sufficient untainted information in the warrant application to support a finding of probable cause. When Ayson's body was found along with his cell phone, the data mined from the phone showed McGee's cell phone number as a recent contact at around the time the gunfire was reported. The number associated with McGee was obtained in the June 3 police report, but also in a *separate* police report from months prior. Therefore, there was

5

In *Mayfield*, this court noted that the primary purpose of Washington's exclusionary rule is to protect the individual right to privacy and to provide a certain remedy when the right is violated. 192 Wn.2d at 882. In this case, McGee suffered a violation of his right to privacy when he was stopped for the suspected drug transaction. McGee obtained the relief guaranteed under our state constitution when the evidence of his drug possession was excluded and the VUCSA charge was dismissed. *Mayfield* recognized that our state constitution confers broad privacy protections, but the case also noted that our exclusionary rule is not designed to permanently immunize suspects from investigation. *Id*. at 896. Thus, certain facts should be allowed as evidence of motive in a subsequent, *unrelated* criminal trial and any concerns regarding the jury improperly weighing the evidence can be remedied using a limiting instruction.

Moreover, I fail to see how allowing police to use evidence in later committed crimes will incentivize police misconduct on the off chance that a suspect may commit a future crime for which the police could potentially use the evidence. The police officers in this case were acting in good faith when they applied for a warrant relying on information from a report in their database, which the officers were not aware was based on an unconstitutional stop. It is reasonable to expect law enforcement officers to respect

---

an independent source for tying McGee to the cell phone number. A Facebook search also tied McGee to the number. Further, as the majority notes, there is a critical distinction between knowledge and evidence. Majority at 23 n.2. Knowledge may be obtained from an illegal detention, such as an officer becoming aware that Ayson and McGee interacted with each other in a public location about a month before the murder. This may lead officers to make a reasonable inference that McGee may be a potential suspect to further investigate combined with the cell data and timing.

6

a suspect's constitutional right to privacy; it is unreasonable to expect officers to be aware and keep track of all court rulings in suppression hearings and the outcomes of all potentially relevant criminal cases. Under the majority's rule, officers applying for warrants must now check court records before relying on any prior police reports, assuming that the police report resulted in a criminal charge, and further assuming the charge resulted in a prosecution and an evidentiary ruling. While beneficial in theory, this is an unreasonable expectation in practice.

With these considerations in mind, I respectfully dissent.

_____
Madsen, J.

_____
González, C.J.

_____
Johnson, J.

_____
Owens, J.