**NOTICE:  SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

FILED
5/30/2023
Court of Appeals
Division I
State of Washington

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 83043-1-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | PUBLISHED OPINION |
| MALCOLM OTHA MCGEE | |
| Appellant. | |

BIRK, J. — As the State acknowledges, a sheriff's deputy unconstitutionally seized Malcolm McGee, questioned him, searched him, and collected his phone number and other information. In a later murder investigation, the State relied on the evidence it had unconstitutionally gathered to connect McGee to the crime and obtain at least four warrants for his phone records, cell site location information, and, among other things, his arrest, all leading to McGee's conviction for second degree murder. The State asks us to hold under Washington's attenuation doctrine the homicide attenuated the taint of the deputy's unconstitutional conduct. Because the State fails to show attenuation, we reverse.

I

A

On June 3, 2017, King County Sheriff's Deputy Alexander Hawley, while working as a plainclothes narcotics detective, observed a man, later identified as Keith Ayson, pacing back and forth on the sidewalk. Hawley observed Ayson

continually look down at a cell phone and then look around the area as if waiting for someone. A silver Chrysler Sebring approached, and Ayson got into the front passenger seat. The vehicle drove approximately one block, then stopped on the side of the road. After no more than two minutes, Ayson exited the Chrysler. Hawley saw Ayson put something small into his pocket. Ayson walked back towards where he had been.

Hawley followed the Chrysler to an apartment complex. Hawley called for backup support. Detective Hawley put on his marked exterior sheriff's vest, exited his vehicle at "about the same time" the driver "exit[ed] his vehicle." Hawley did not recognize the driver. Hawley "announced [himself] as law enforcement and ordered [the driver] to stay in the vehicle."

Detective Hawley made contact with the driver. The driver identified himself as Malcolm McGee. Before June 3, 2017, Hawley had never met or seen McGee. Hawley ordered McGee out of the vehicle and provided Miranda[1] warnings. Hawley explained he had "just watched" the interaction with Ayson and asked McGee, "[W]here's the dope?" McGee initially said it was all gone, but then produced a "baggie" of cocaine. Hawley asked to search McGee's car. McGee granted permission. Hawley found a bag filled with smaller baggies. McGee said Ayson was his supplier, and he had purchased the cocaine from Ayson during the interaction Hawley observed. Hawley invited McGee to "work off" his possession charge by entering into a confidential informant agreement to provide information

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

and conduct a controlled buy.   McGee signed a written agreement.   McGee provided Hawley with his phone number.  McGee never contacted Hawley.

Hawley returned to his original location to look for Ayson.  Hawley found Ayson and interviewed him.  Ayson said he knew McGee as "TJ."  Ayson reported he had purchased cannabis from TJ.  According to Ayson, he had known TJ for about two months, and regularly bought cocaine and cannabis from him.   He denied being a drug dealer.  Ayson did not have any illegal drugs on his person. He also did not have any items of contraband suggesting he was selling drugs, and he had no money.

Hawley showed McGee's latest King County Jail booking photo to Ayson, who confirmed McGee was the person he knew as TJ.  Hawley concluded McGee was the dealer and had fabricated the story about Ayson.  Hawley placed a report from this incident into a police database.  Later, Hawley completed a certification for determination of probable cause and McGee was charged with Violation of the Uniform Controlled Substances Act (VUCSA).

B

The next day, June 4, 2017, witness Ronald Elliott called 911.  Elliott lived on a dead-end street adjacent to a forested creek bed.  Elliott testified he saw two men walking away towards the dead-end and a car he estimated was about a 2000 Chrysler, silver or silver-gray, with tinted windows.[2]  After an unknown period of

---

[2] We acknowledge the existence of inconsistencies between Elliott's and another witness's reports, but these inconsistencies are not material to our analysis concerning the information Hawley learned from McGee during the June 3 stop.

time, Elliott heard gunshots and called 911. Within minutes of hearing the gunshots, Elliott saw the silver car drive away. Police responded to Elliott's 911 call, arriving between 4:25 p.m. and 4:29 p.m. The police searched the forested creek bed but found nothing amiss.

C

On July 11, 2017, after investigating a concerning odor, Elliott discovered a body in the forested creek bed. Responding police recovered a wallet containing Ayson's identification with the body. The King County Medical Examiner's office later confirmed identification of the body as Ayson. Police found a phone with the body and recovered its SIM (subscriber identity module) card, but could not otherwise access the phone's contents.

Within 15 minutes of discovering Ayson's identification, a detective searched for Ayson's name in a police database. This inquiry produced Hawley's report of his interaction with McGee and Ayson on June 3, 2017. The report included McGee's name, his phone number and his association with the Chrysler he was driving on June 3, 2017. A search for McGee's number in the database found another report showing McGee was investigated on March 13, 2017. A later search of Facebook for McGee's phone number led to McGee's Facebook profile. Although the record does not indicate when, officers investigating the death also spoke to Hawley about the June 3 stop.

The search for Ayson's name in the database identified Desiree Burchette as connected to him. On July 11 and July 19, 2017, police interviewed Burchette, who stated Ayson was her boyfriend. During the July 19 interview, they showed

4

Burchette a photograph of McGee from a jail booking database. Burchette said, "That's him" and identified McGee as Ayson's drug dealer. Burchette testified that McGee had once picked her up near the same location where Hawley had seen him with Ayson. She stated she recognized McGee by his hairstyle and car and as "the guy that [Ayson] got in the car with all the time." She had observed McGee with Ayson numerous times over four or five months.

On July 13, 2017, police obtained a warrant for service provider records for two phone numbers: the phone number associated with the SIM card found with Ayson's body and, relying on information from the June 3 stop, the phone number Hawley had obtained from McGee. On July 26, 2017, police received responsive records with call data for Ayson's and McGee's phones. These records indicated the last two outgoing calls from Ayson's phone had been placed to McGee's phone on June 4 at 3:20 p.m. and 3:43 p.m. The records included cell site location information suggesting both phones were in the same vicinity at 3:43 p.m., the vicinity of Hawley's June 3 observation of McGee and Ayson. The cell site location information showed that at 4:07 p.m., McGee's phone connected to a cell tower approximately one quarter mile from the place where Ayson's body was found. Between 4:09 p.m. and 4:11 p.m., McGee's phone received several calls connecting through the same cell tower. His phone did not connect to that tower any other time that day.

Relying on information obtained during the June 3 stop and the July 13 warrant, police obtained subsequent warrants: for service provider records of phone numbers that called McGee's phone around the time of the June 4, 2017

5

911 call; for searching the apartment of McGee's girlfriend, the silver Chrysler Sebring, McGee's cell phone, and another vehicle associated with McGee; and for additional service provider records for McGee's phone, a cell phone belonging to McGee's girlfriend, and to search a third vehicle associated with McGee.

On August 1, 2017, police obtained a warrant to arrest McGee based on the VUCSA charge stemming from the June 3 stop. McGee was not told he was the subject of a homicide investigation. After the arrest, and while police were transporting McGee, McGee stated he had not called the other detective back because the person he was going to provide information on had been murdered. While being interviewed, McGee acknowledged his cell phone number, the June 3 interaction with Ayson, and speaking by phone with Ayson the next day. McGee denied meeting Ayson on June 4, 2017, and invoked his right to counsel when confronted with the cell site location information.

D

McGee's first trial ended in a hung jury. McGee was convicted of second degree murder at a second trial. During McGee's first trial, the court ruled that Hawley did not have reasonable articulable suspicion for the June 3 stop. The State does not challenge this ruling. The trial court suppressed reference to the drugs Hawley found when searching McGee in the June 3 stop and the arrest. On McGee's motion and without objection by the State, the trial court dismissed the VUCSA charge. The pretrial motions and evidentiary rulings from the first trial remained in effect for the second.

6

Before his second trial, McGee moved to suppress evidence from the warrants, including the July 13, 2017 warrant and the subsequent warrants. The trial court denied this motion, concluding the causal chain between the June 3 stop and the warrants was "severed by the murder of Keith Ayson that occurred after the stop of June 3rd and the ensuing investigation." The trial court concluded McGee's "privacy rights were protected by dismissing the items that were directly the result of the illegal detention." McGee also moved to suppress the identification made by Burchette. The trial court admitted the photo identification because, although it was impermissibly suggestive, it did not create a substantial likelihood of irreparable misidentification.

II

Article I, section 7 of the Washington constitution states in part, "No person shall be disturbed in [their] private affairs . . . without authority of law." Washington courts apply an exclusionary rule for evidence obtained in violation of this provision. State v. Mayfield, 192 Wn.2d 871, 888-89, 434 P.3d 58 (2019). The attenuation doctrine is a recognized exception to exclusion and applies, generally, when the connection between official misconduct and the discovery of evidence may " 'become so attenuated' " as to dissipate the taint of the misconduct and allow the evidence to be used despite the misconduct playing a role in its discovery. See Wong Sun v. United States, 371 U.S. 471, 491, 83 S. Ct. 407, 9 L. Ed. 2d 441

7

(1963) (quoting <u>Nardone v. United States</u>, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939)).

Article 1, section 7 is more protective of privacy than the Fourth Amendment of the United States Constitution. <u>Mayfield</u>, 192 Wn.2d at 878. Washington follows a "nearly categorical" rule of excluding from trial evidence obtained in violation of article 1, section 7, with "no exceptions that rely on speculation, the likelihood of deterrence, or the reasonableness of official misconduct." <u>Id.</u> at 888. The "narrow, Washington-specific attenuation doctrine" applies "if, and only if, an unforeseeable intervening act genuinely severs the causal connection between official misconduct and the discovery of evidence." <u>Id.</u> at 897-98. To determine whether an intervening act is sufficiently attenuating, Washington looks to the tort law doctrine of superseding cause. <u>Id.</u> at 897. Under this standard, when " 'an independent, intervening act of a third person is one which was not reasonably foreseeable then there is a break in the causal connection between the . . . negligence and the . . . injury.' " <u>Id.</u> at 897 (quoting <u>Schooley v. Pinch's Deli Mkt., Inc.</u>, 134 Wn.2d 468, 482, 951 P.2d 749 (1998)).

"[T]he 'theoretical underpinning of an *intervening* cause which is sufficient to break the original chain of causation [i.e., constitute a superseding cause] is the *absence of its foreseeability*.' " <u>Campbell v. ITE Imperial Corp.</u>, 107 Wn.2d 807, 813, 733 P.2d 969 (1987) (alteration in original) (quoting <u>Herberg v. Swartz</u>, 89 Wn.2d 916, 927, 578 P.2d 17 (1978)).[3] "Reasonable foreseeability does not

---

[3] <u>Campbell</u> identifies nonexclusive factors in assessing the foreseeability of an alleged intervening act, including, "whether (1) the intervening act created a *different type of harm* than otherwise would have resulted from the actor's

require that the precise manner or sequence of events in which a plaintiff is harmed be foreseeable. . . . '[I]f the likelihood that a third person may act in a particular manner is . . . one of the hazards which makes the [defendant] negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the [defendant] from being liable' for the injury caused by the defendant's negligence." Albertson v. State, 191 Wn. App. 284, 297, 361 P.3d 808 (2015) (some alterations in original) (quoting Campbell, 107 Wn.2d at 813). "[I]ntervening criminal acts may be found to be foreseeable, and if so found, actionable negligence may be predicated thereon." McLeod v. Grant County Sch. Dist. No. 128, 42 Wn.2d 316, 321-22, 255 P.2d 360 (1953) (superseding cause was fact question for jury where school district created unsupervised place of concealment in which student raped another).[4] When an act of misconduct is followed by a subsequent criminal act, the subsequent act is not a superseding cause based

---

negligence; (2) the intervening act was *extraordinary* or resulted in extraordinary consequences; (3) the intervening act *operated independently* of any situation created by the actor's negligence." 107 Wn2.d at 812-13 (citing RESTATEMENT (SECOND) OF TORTS § 442 (1965)).

[4] Accord Christen v. Lee, 113 Wn.2d 479, 492-93498, 780 P.2d 1307 (1989) (criminal assault not a foreseeable result of furnishing intoxicating liquor to obviously intoxicated person, unless drinking establishment had notice of possibility of harm from prior actions of the person); Whitehead v. Stringer, 106 Wash. 501, 505-06, 180 P. 486 (1919) (King County sheriff's deputy may be liable in tort based on having reason to know arrestee's vehicle would be criminally vandalized after warrantless arrest); Johnson v. State, 77 Wn. App. 934, 942, 894 P.2d 1366 (1995) ("A criminal act may be considered foreseeable if the actual harm fell within a general field of danger which should have been anticipated. The court may determine a criminal act is unforeseeable as a matter of law only if the occurrence is so highly extraordinary or improbable as to be wholly beyond the range of expectability. Otherwise, the foreseeability of the criminal act is a question for the trier of fact.").

merely on its being criminal, but will be a superseding cause only if it is not foreseeable as that term is used in tort law.

Washington decisions have in some cases allowed evidence discovered after an illegal search that came to light because of a new event—in these cases a new voluntary act by a person other than law enforcement. In State v. Childress, 35 Wn. App. 314, 315, 666 P.2d 941 (1983), police in California conducted an illegal search and discovered the defendant's Washington driver's license, a bank check showing an Everett, Washington address, and a photograph of two nude girls. Id. California officers forwarded the information to Everett police, who canvassed the neighborhood around the address and located the parents of one of the girls in the photograph. Id. The parents made a general, nonsuggestive inquiry of their daughter, who disclosed sexual involvement with the defendant. Id. at 315-16. Under the attenuation doctrine, the daughter's new, voluntary disclosure was the cause of the new discovery of her testimony. Id. at 317.

Other Washington decisions have concluded new acts of free will by the defendant attenuated the taint of earlier official misconduct. In State v. Rousseau, 40 Wn.2d 92, 95-96, 241 P.2d 447 (1952), overruled on other grounds by State v. Valentine, 132 Wn.2d 1, 935 P.2d 1294 (1997), after an initial illegal search and detention, a detainee pushed an officer into the path of an oncoming car, giving the officer a new and legal justification to arrest the detainee and lawfully perform a search incident to arrest. In State v. Mierz, 72 Wn. App. 783, 794-95, 866 P.2d 65, 875 P.2d 1128 (1994), aff'd, 127 Wn.2d 460, 901 P.2d 289 (1995), after an initial illegal entry by officers, the defendant initiated assaults on the officers and

10

the court allowed evidence of the assaults. In State v. Aydelotte, 35 Wn. App. 125, 127, 132, 665 P.2d 443 (1983), after an illegal entry, the defendant brandished a weapon towards approaching officers, and the court allowed evidence of these assaults.

The State points to the homicide of Ayson as a superseding cause of police discovering the evidence Hawley learned from McGee during the June 3 stop, arguing the homicide was "an independent act of free will that was not influenced by any suggestion or coercion from law enforcement." But the State points to no new discovery of the information Hawley learned during the June 3 stop. Hawley's June 3 stop was the cause of the State's discovery that day of McGee's name, his phone number, his stated reasons for associating with Ayson, and his possession of cocaine and drug paraphernalia. The homicide that the State believes occurred the next day, June 4, 2017, was not a cause of any of the State's June 3, 2017 discoveries. The later recovery of Ayson's body led the State to look again at its June 3, 2017 discoveries, but it did not cause those discoveries to occur. The homicide was not a cause of the discovery of evidence in the June 3 stop, and was not an intervening act amounting to a superseding cause.

Recognizing the homicide came after its June 3 discoveries, the State argues the attenuation doctrine applies because the June 4 homicide was the cause of its "derivative use" of its June 3 discoveries. Mayfield is clear, however, there must be a superseding cause severing the causal connection "between" the official misconduct and "the discovery" of the evidence. 192 Wn.2d at 895-96. The State invokes the attenuation doctrine to justify using its original, illegal June 3

11

discoveries, rather than a new discovery attributable to a new, superseding cause. The State cites no case applying the attenuation doctrine in this manner. The State fails to show attenuation as defined in Mayfield allowing the use of the information Hawley illegally discovered from McGee on June 3, 2017.[5]

The State last argues its recognition of the relationship between McGee and Ayson after recovering Ayson's body "merely spurred a separate investigation that was conducted by different personnel, served an unrelated purpose, and occurred much later than Detective Hawley's initial detention." The trial court concluded, "Detectives found McGee's phone number in their database from a March 2017 contact"—a contact whose legality is not questioned before this court—"and from a search of McGee's public Facebook profile."[6] Separate from the June 3 stop, the State discovered Ayson's SIM card, obtained the records associated with that SIM card, from those records learned the last number dialed from Ayson's phone and that it was dialed twice on the afternoon of June 4, 2017, near in time to the

---

[5] The State argues that Hawley's illegal seizure and search were not the "legal cause" of the discoveries he made that day, referring to the legal causation prong of the tort proximate cause rule. The State's brief then turns to cases analyzing superseding cause. This comingles different doctrines. The tort doctrine of legal causation is relevant to establishing a causal connection. "The focus in the legal causation analysis is whether, as a matter of policy, the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability. A determination of legal liability will depend upon 'mixed considerations of logic, common sense, justice, policy, and precedent.'" Schooley, 134 Wn.2d at 478-79 (internal quotation marks omitted) (quoting King v. City of Seattle, 84 Wn.2d 239, 250, 525 P.2d 228 (1974)). The question the attenuation doctrine poses under Mayfield is whether an existing causal connection between the official misconduct and the discovery of evidence was severed by an intervening act amounting to a superseding cause.

[6] These conclusions were in connection with the trial court's analysis of the independent source doctrine. The State does not rely on the independent source doctrine on appeal. Therefore we do not address it.

911 call, learned the number was associated with McGee based on the March 2017 encounter and Facebook entries, and learned Ayson's drug dealer, known as "TJ" drove a silver Chrysler. These circumstances were not causes of the State's June 3 discoveries from McGee. The State's argument amounts to an inevitable discovery argument, because, through Ayson's phone records and other evidence, "the police would have discovered" McGee's identity and connection to Ayson "notwithstanding the violation of [McGee's] constitutional rights" in the June 3 stop. State v. Winterstein, 167 Wn.2d 620, 634, 220 P.3d 1226 (2009). But the inevitable discovery exception to the exclusionary rule is inconsistent with article 1, section 7 because it "is necessarily speculative and does not disregard illegally obtained evidence." Id. That Ayson's information would have led to McGee is insufficient.

The State says it is "unnecessary" to "individually analyze[] each search warrant and [McGee's] August 1, 2017, arrest," because "Hawley's detention was a cause-in-fact for this entire body of evidence." "Thus," the State says, "the admissibility of each portion depends on the answer to the same legal question," that is, the application of the attenuation doctrine. We understand the State to concede that if Hawley's June 3 discoveries from McGee cannot be used under the attenuation doctrine, then each subsequent warrant fails. In light of Mayfield and Winterstein, it is necessary to suppress the June 3 discovery of McGee's name, his phone number, his stated reasons for associating with Ayson, and his possession of cocaine and drug paraphernalia. Because each subsequent warrant including the August 1, 2017 arrest warrant depended on this information for

13

probable cause, it is necessary to suppress the information learned from these warrants, including McGee's custodial statements on August 1, 2017. The State does not contend there was "untainted evidence admitted at trial" that was "so overwhelming that it necessarily leads to a finding of guilt." State v. Elwell, 199 Wn.2d 256, 270, 505 P.3d 101 (2022). We therefore reverse McGee's conviction.

III

After the trial court ruled the June 3 stop unconstitutional and suppressed evidence of the cocaine, drug paraphernalia, and the arrest, the State made a motion arguing evidence of the June 3 stop and information discovered during the stop should be admitted as motive evidence supporting the murder charge. The State's theory at trial was that McGee thought Ayson "had 'snitched' on him" and had "set him up," and McGee killed Ayson believing Ayson "was responsible for his arrest and may also be working with police." The trial court granted the State's motion. The trial court delineated the scope of its ruling as follows:

> I am, again, excluding any statements attributed to Mr. McGee that would have been made to the detective. I am excluding any contraband object that would have been found in Mr. McGee's possession or found in his car.
> I am not excluding the fact that the detective observed Mr. McGee or the person who he later identified to be Mr. McGee, what happened. And I'm not excluding the fact of the [confidential informant] agreement.

McGee challenges the admission of evidence related to the June 3 stop for the purpose of showing motive, arguing there is no such exception to the exclusionary rule.

14

We agree with McGee there is no "motive" exception to the exclusionary rule. But we perceive a distinction between the evidence Hawley obtained illegally during the June 3 stop, and information he learned that day distinct from the illegal seizure and search. "Under the limits on surveillance established by our case law, a police officer's visual surveillance does not constitute a search if the officer observes an object with the unaided eye from a nonintrusive vantage point." State v. Young, 123 Wn.2d 173, 182, 867 P.2d 593 (1994). Hawley's discovery on June 3 of McGee's name, his phone number, his stated reasons for associating with Ayson, and his possession of cocaine and drug paraphernalia stemmed from the illegal seizure of McGee and the subsequent search. But to the extent not the result of the illegal seizure and search, Hawley's testimony concerning the events of June 3, 2017 is not subject to exclusion under article 1, section 7, and to the extent not excluded may be used by the State to establish motive. Provided evidence obtained in violation of article 1, section 7 is suppressed, the trial court on remand is in the best position to determine the admissibility of other evidence relevant to motive.

IV

McGee next asserts the trial court erred by admitting the identification by Burchette. We disagree.

When reviewing the denial of a CrR 3.6 suppression motion, we review the trial court's findings of fact for substantial evidence and its conclusions of law de novo. State v. Derri, 199 Wn.2d 658, 676, 511 P.3d 1267 (2022) (reviewing trial court's application of Manson v. Brathwaite, 432 U.S. 98, 116, 97 S. Ct. 2243, 53

15

No. 83043-1-I/16

L. Ed. 2d 140 (1977)).[7]  "The presentation of a single photograph is, as a matter of law, impermissibly suggestive."  State v. Maupin, 63 Wn. App. 887, 896, 822 P.2d 355 (1992).  "However, impermissible suggestiveness may not constitute a violation of due process.  Rather, [a] court must review the totality of the circumstances to determine whether that suggestiveness created a substantial likelihood of irreparable misidentification."  Id. at 896-97 (citation omitted).  This is determined by considering four factors: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of their prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.  Id. (citing Brathwaite, 432 U.S. at 114).  The identification of a suspect by an acquaintance does not raise the due process concerns that arise when an eyewitness identification is tainted by suggestive procedures.  State v. Collins, 152 Wn. App. 429, 436, 216 P.3d 463 (2009).

The trial court analyzed each of the Brathwaite reliability factors.  The court ruled, "Even though [the identification] initially was suggestive, it does not show a substantial likelihood that there would be irreparable misidentification."  The court's conclusion was based on evidence including the testimony of detectives who interviewed Burchette and a transcript of an interview of Burchette conducted by Greg Walsh, a private investigator for the defense.  This evidence showed

---

[7] CrR 3.6(b) requires trial courts to enter written findings of fact and conclusions of law.  The trial court did not do so here.  However, such an error is harmless "if the court's oral findings are sufficient to allow appellate review."  State v. Miller, 92 Wn. App. 693, 703, 964 P.2d 1196 (1998).  The court's oral ruling is sufficient to allow review.

16

Burchette was identifying an acquaintance she was familiar with, not an individual she knew only from witnessing a crime. Substantial evidence supported the trial court's factual findings, and the findings support the conclusion McGee's due process rights were not violated by admitting Burchette's identification of McGee.[8]

Reversed and remanded.

_Birk, J._

WE CONCUR:

_Bowman, J_ _Dwyer, J._

---

[8] Because of our disposition, it is not necessary to reach McGee's remaining assignments of error.