# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 88034-9-I |
| Respondent, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| SHAMARR DERRICK PARKER, | |
| Appellant. | |

BIRK, J. — We are asked whether Washington's attenuation doctrine permits the government to use information police learned from a witness, even though an illegal search was a contributing cause to their learning the witness's identity and conversing with her for the first time. Police identified Shamarr Parker as a suspect in an alleged rape, robbery, and kidnapping, and obtained a pen register trap and trace (PRTT) order allowing them to use cell signals to locate his phone. But they exceeded the scope of the PRTT order by additionally using a cell site simulator (CSS) to confirm the precise location of Parker's phone. Having confirmed their proximity to Parker's phone, police stopped the vehicle he occupied as a passenger. During the stop, they encountered the driver of the vehicle, D.B., Parker's girlfriend, who made statements to the police later that day and in the weeks following that the State offered against Parker at trial. We conclude D.B.'s cooperation with the police was an independent act of free will, beyond the foreseeable results of using the CSS, making it a superseding cause of the

discovery of her testimony, and making the testimony admissible. We further conclude Parker was not entitled to resentencing under State v. Blake, 197 Wn.2d 170, 481 P.3d 521 (2021). We affirm Parker's conviction and sentence, and remand to strike the community supervision fee.

I

A

We summarized the background facts of this case in an earlier appeal:

> In December 2008, 17-year-old A.W. arrived home late and told her mother, Tracy Nephew, that a stranger had raped her at knifepoint. Nephew called 911. A.W. went to the hospital and a [sexual assault nurse examiner] examined her.
> Police identified Parker as a suspect based on A.W.'s recollection of the alleged attacker's car and license plate number. Pierce County Superior Court issued an arrest warrant for Parker. Also, police obtained a search warrant to use a [PRTT] device to locate Parker. They also used a CSS, which they had not disclosed in their warrant application. Police found Parker at the home of [D.B.], an ex-girlfriend with whom Parker shared a child. When Parker left the residence with [D.B.], police followed them and arrested Parker in a parking lot.
> The State charged Parker with first degree kidnapping, first degree robbery, and first degree rape, all with a deadly weapon. A jury found Parker guilty of first degree kidnapping and first degree robbery both with a deadly weapon. The jury deadlocked on the rape charge.

State v. Parker, No. 82049-4-I, slip op. at 2-3 (Wash. Ct. App. May 24, 2021) (unpublished) (footnote omitted), https://www.courts.wa.gov/opinions/pdf/820494.pdf. We affirmed Parker's convictions on direct appeal. Id. at 3. Later, we granted a personal restraint petition, vacated Parker's convictions, and remanded for a new trial. In re Pers. Restraint of Parker, No. 45163-8-II, slip op. at 1 (Wash. Ct. App. July 21, 2015) (unpublished), https://www.courts.wa.gov/

opinions/pdf/D2%2045163-8-II%20%20Unpublished%20Opinion.pdf. By the time of the second trial, Parker had discovered that the police had used a CSS to locate him before his arrest, despite not mentioning its planned use in their warrant application. Parker, No. 82049-4-I, slip op. at 3. Parker moved to suppress the evidence discovered as a result of the search, including D.B.'s testimony, and the trial court denied the motion. Id. At the second trial, the court admitted D.B.'s testimony (read from the transcript of the first trial) that she saw Parker on the night of the incident, and he told her that "he hit a lick," which she described as "like a robbery." Parker told D.B. that "he got some girl for some weed," and used a knife to do it. D.B. testified that Parker was wearing a black jacket that night and washed it approximately three times between that night and the day he was arrested. D.B. gave the black jacket to detectives. The jury acquitted Parker of rape in the first degree, but found Parker guilty of kidnapping and robbery in the first degree, both with a deadly weapon. Id. at 4.

Parker appealed his convictions and argued the trial court should have suppressed D.B.'s testimony as fruits of the illegal use of the CSS. Id. at 9-10. We agreed that the police had improperly exceeded the scope of the PRTT order, turning the focus to attenuation. Id. at 12-13. After trial, but before our decision, the Supreme Court decided State v. Mayfield, 192 Wn.2d 871, 874-75, 434 P.3d 58 (2019), holding that attenuation may be found only when intervening circumstances have genuinely severed the causal connection between official misconduct and the discovery of evidence. In light of Mayfield, we remanded for

3

the trial court to hold a suppression hearing on the issue of attenuation with respect to the CSS and D.B.'s testimony. Parker, No. 82049-4-I, slip op. at 2, 13.

B

The following testimony was elicited at the suppression hearing on remand. Retired Tacoma Police Detective Bradley Graham testified that he believed Parker to be a suspect in the rape, robbery, and kidnapping of A.W., but did not know where Parker was located. Graham contacted Parker's family members and learned that Parker had a girlfriend with whom he had been staying. Retired Tacoma Police Detective Terry Krause testified that he obtained a PRTT order and geolocate order to find Parker's phone. With the order, Parker's phone company sent officers geolocation "pings" every 15 minutes. Krause testified that on January 6, 2009, he "got a specific ping back and asked Detective Graham if there was anybody related to the case in the area of that ping, and [Detective Graham] knew of a house."

Detective Jennifer Quilio testified that on January 6, 2009, she received a call from a sergeant providing her with an address that might have been associated with Parker. Detective Quilio researched the address and learned that D.B. lived there. Another detective advised Detective Quilio that he had a recent case assignment involving D.B. at that address, and the father of D.B.'s youngest child was most likely Parker. Krause went to the provided address with the CSS to verify that Parker's phone was there. Krause testified that "[w]e got in the area, set up the equipment, and then drove by to see what would happen, and we captured the phone so we were able to direction find and put it right in the house."

While undercover officers were watching the house, a vehicle left with two occupants. In Detective Quilio's report of the incident, which was admitted at the hearing, she wrote that officers "saw a grey Suburban arrive at the house and the sole occupant, a female, got out and went inside. While they waited the same female came out and got back into the Suburban with a passenger." The report noted "that it appeared the passenger was a male with braids, which matche[d] Parker's description." Krause again used the CSS to confirm that the phone was in the vehicle. Officers stopped the vehicle, detained the passengers, and identified them as Parker and D.B. D.B. told officers she had a gun in the vehicle. An officer took the gun for "safekeeping" and gave the gun to Officer Quilio.

Detective Quilio introduced herself to D.B. and arranged to meet at D.B.'s house to speak. Officer Quilio told D.B. that she had possession of the gun, and would return it to D.B. at the end of their conversation. Detective Quilio testified that she could not remember what D.B.'s response to her retaining possession of the gun was, but noted that "there wasn't any further discussion about it." Detective Quilio testified that she kept the gun for officer safety, as it was not "very safe to let somebody leave with a weapon when you've already arranged to meet them secondary to that."

Detective Quilio testified that she did not tell D.B. that she was required to speak to the officers and that if D.B. had declined to speak with her, she could not have forced her to speak. Detective Quilio told D.B. that they were looking for a specific jacket that had been described by A.W., and D.B. provided a black zippered coat that "had been a topic of discussion between" D.B. and Parker.

Detective Quilio testified that D.B. did not provide any information about the incident with A.W. and instead wanted to speak about her daughter. This was because after police told D.B. the crimes they suspected Parker had committed, D.B. became concerned Parker could have sexually abused her children.

Following this conversation at the house on January 6, 2009, Detective Quilio and D.B. had numerous phone conversations, with D.B. trying to schedule a forensic interview for her daughter. On January 22, 2009, Detective Quilio and D.B. spoke on the phone, and D.B. volunteered that she had been withholding information about the incident involving A.W. D.B. initiated this part of the conversation on her own. D.B. told Detective Quilio that she knew who A.W. was because of Parker's phone, and D.B. had a conversation with Parker about "how this had been some sort of [cannabis] transaction that hadn't gone well." D.B. said that Parker had come to her house on December 19, 2008, and told D.B. that he had stolen cannabis from a girl, whom D.B. identified as A.W., and used a knife to threaten her. Detective Quilio testified that D.B. volunteered this information and stated that she was coming forward with the information because she had received threatening phone calls from Parker's family and friends following his arrest. Detective Quilio characterized her contact with D.B. as "coming from [D.B.]. She was the one insisting and pursuing that contact from that initial meeting on the 6th of January through the forensic interview."

The trial court concluded that D.B.'s "own independent free will severed the causal chain between police use of the CSS prior to Parker's arrest and the

information she later provided to police of her own volition." The trial court denied Parker's motion to suppress D.B.'s testimony.

C

Also on remand, Parker filed a CrR 7.8 motion for relief from judgment pursuant to Blake. At Parker's 2018 sentencing, the trial court calculated Parker's offender score as 12, which included one count of conspiracy to possess a controlled substance. His offender score made the standard range for kidnapping 149 months to 198 months, and the standard range for robbery 129 months to 171 months. The court sentenced Parker to the high end of the range for each count and added a consecutive 24-month deadly weapon enhancement to each count, for a total of 246 months' confinement. In his CrR 7.8 motion, Parker argued resentencing was warranted because his 2018 sentence included reference to a Blake offense. The State conceded that Parker's 2018 judgment and sentence included a Blake conviction, but contended that Parker was not entitled to resentencing because, with his offender score still above 9, his standard sentencing range would be unaffected.

The court agreed that that the reduction of Parker's offender score by one point would not affect the outcome of the sentence. The 2022-2023 remand proceedings, including Parker's 2023 CrR 7.8 motion, were heard before the same judge who had sentenced Parker in 2018. Although the judge noted he had referenced Parker's criminal history as one of the factors he had considered at sentencing, the judge stated that "possession of drugs had nothing to do with the

sentence whatsoever" and it had "to do with the violent conduct."[1]  The trial court ruled that Parker was not eligible to have a corrected judgment or adjusted sentence because "his sentence would not change as a result of any Blake relief granted by the court in this and/or other Pierce County cases and/or the removal from consideration of Blake-affected convictions from other jurisdictions."

Parker appeals.

II

Parker argues D.B.'s testimony should have been suppressed because the State failed to satisfy the attenuation doctrine as set forth in Mayfield.  We disagree.

A

Parker assigns error to three findings of fact from the suppression hearing. When reviewing a trial court's denial of a motion to suppress, we review whether substantial evidence supports the challenged findings of fact and if so, whether the findings support the conclusions of law.  State v. Ward, 182 Wn. App. 574, 587, 330 P.3d 203 (2014).  We accept unchallenged findings of fact as true.  State v. Luther, 157 Wn.2d 63, 77-78, 134 P.3d 205 (2006).

Parker assigns error to finding of fact 7, which states, "On January 6, 2009, police observed Parker and [D.B.] leave her residence, and get in a vehicle and drive away.  Police again used the CSS to confirm that Parker was in the vehicle.

---

[1] In response to the judge's statement, Parker's counsel interjected that the 2018 jury had acquitted Parker of rape.  To the extent Parker's counsel meant to suggest there was not "violent conduct" before the court, that was inaccurate. Parker's criminal history included conviction for three counts of assault in the second degree, and the current offenses at sentencing included the jury's conviction for kidnapping and robbery at knife-point of A.W.

Police stopped the vehicle [D.B.] was driving and arrested Parker." At the suppression hearing, Detective Quilio testified that on January 6, 2009, officers observed two individuals exit D.B.'s residence, enter a vehicle, and leave. Officers subsequently stopped the vehicle, detained the occupants, and identified them as Parker and D.B. Detective Quilio testified that D.B. was driving the vehicle and Parker was the passenger. Krause testified that he used the CSS to confirm that the phone was in the vehicle that drove away from the address before officers made an arrest. We agree with Parker that in stating police observed Parker leaving the residence, the finding potentially goes somewhat farther than the evidence, which described only a male matching Parker's description. However, we do not read the finding as stating that the police had identified Parker as the passenger of the vehicle before his arrest. Instead, the finding states that two individuals were seen leaving D.B.'s residence, and the individuals were later determined to be D.B. and Parker. Substantial evidence supports finding of fact 7.

Parker assigns error to findings of fact 16 and 17, which state,

16.  In the weeks following January 6, 2009, [D.B.] had several discussions with Detective Quilio. These conversations solely pertained to [D.B.'s] concerns that Parker had sexually abused [her daughter.] Detective Quilio communicated with [D.B.] in regard to these concerns. [D.B.] pressed the issue of wanting further investigation into the issue of whether Parker had possibly molested [her daughter.]

17.  During the conversations in the weeks following January 6, 2009, Detective Quilio did not ask [D.B.] any questions about the investigation involving A.W. Detective Quilio had no reason to believe [D.B.] had any additional information about Parker's crimes against A.W. She did not plan to speak with

> [D.B.] further about that investigation. During these conversations, [D.B.] did not make any statements about Parker's crimes against A.W.

Detective Quilio testified that she had multiple contacts with D.B. after January 6, 2009, the focus of D.B.'s attention during those conversations was about her daughter and attempting to obtain a forensic interview, and Detective Quilio was not trying to reach D.B. to interview her about the incident with A.W. Detective Quilio testified she "wouldn't have known that [D.B.] was withholding information until she provided it on the 22nd, so there wasn't additional questioning." Unchallenged finding of fact 18 states that Detective Quilio spoke with D.B. after January 6, 2009 "because she was doing her job in following up regarding a complaint of possible sexual abuse. This was the sole reason Detective Quilio was maintaining contact with [D.B.] during this time period," and the detective "did not maintain contact with [D.B.] out of any interest related to the investigation involving Parker's crimes against A.W." The challenge to these findings focuses on whether the intervening discussions broached *solely* the topic of D.B.'s concerns for her daughter *to the exclusion of* the crimes against A.W. While Detective Quilio did not state in so many words that the intervening conversations never strayed from the one topic to the other, it is nevertheless a reasonable inference from Detective Quilio's statements that that was substantially the case. Substantial evidence supports findings of fact 16 and 17.

B

Parker assigns error to all the trial court's conclusions of law that the State was entitled to use D.B.'s statements under Washington's attenuation doctrine.

10

We review conclusions of law relating to the suppression of evidence de novo. State v. Betancourth, 190 Wn.2d 357, 363, 413 P.3d 566 (2018).

Individuals enjoy a fundamental right under both the federal and state constitutions to be free from unlawful searches and seizures. See U.S. CONST. amend. IV; WASH. CONST. art. I, § 7. Article I, section 7 of the Washington Constitution states, "No person shall be disturbed in [their] private affairs . . . without authority of law." As a general rule, we exclude from court proceedings any evidence obtained in violation of these rights. See State v. McGee, 3 Wn.3d 855, 865, 557 P.3d 688 (2024). The exclusionary rule extends to "verbal evidence" derived "immediately from an unlawful entry and an unauthorized arrest." Wong Sun v. United States, 371 U.S. 471, 485-86, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The attenuation doctrine operates as an exception to the exclusionary rule. McGee, 3 Wn.3d at 866. Washington has long recognized that article I, section 7 "is more protective of individual privacy than the Fourth Amendment to the United States Constitution." Id. at 865. To come within Washington's attenuation doctrine, the State must prove "that intervening circumstances gave rise to a superseding cause that genuinely severed the causal connection between official misconduct and the discovery of evidence." Mayfield, 192 Wn.2d at 883.

Both Mayfield and Wong Sun applied the exclusionary rule to evidentiary discoveries ostensibly offered by a witness (in each case the defendant), that were not attenuated from police misconduct. In Mayfield, the arresting officer unlawfully seized the defendant. Id. at 876-77. While seized, the defendant consented to a pat-down search, during which the officer found a large amount of cash that the

officer suspected resulted from drug transactions. Id. at 876. The officer obtained consent to search the defendant's vehicle, where he found methamphetamine. Id. The Supreme Court held the defendant's consent "was the direct, foreseeable result of" the illegal seizure because "consent to search during an ongoing unlawful seizure, even if preceded by Ferrier[2] warnings, is entirely foreseeable and not an independent act of free will" sufficient to establish a superseding cause and satisfy Washington's narrow attenuation doctrine. Id. at 900-01. The court concluded that giving consent to search during an unlawful seizure is "very different from independently volunteering to be searched," and Mayfield "had no time to reflect on his options and was not free to leave." Id. at 900.

In Wong Sun, six or seven police officers broke down the front door of one of the defendants, Toy, followed Toy into the bedroom where his family was sleeping, and "almost immediately" handcuffed and arrested him. 371 U.S. at 486. Officers confronted Toy with evidence that he had been selling drugs, and Toy provided information incriminating himself and others. Id. at 474-75. The United States Supreme Court held that Toy's declarations were inadmissible because "it is unreasonable to infer that Toy's response was sufficiently an act of free will to purge the primary taint of the unlawful invasion." Id. at 486.

But the attenuation doctrine permits the use of evidence discovered after an illegal search that came to light because of a new event—which "may take the form of an independent act of free will by someone other than law enforcement, including by the defendant." McGee, 3 Wn.3d at 868. In Wong Sun, the co-

---

[2] State v. Ferrier, 136 Wn.2d 103, 960 P.2d 927 (1998).

defendant, Wong Sun, was arrested without probable cause in violation of the Fourth Amendment. 371 U.S. at 491. Then he was "released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later" to make a confession. Id. In concluding that the confession was admissible, the court recognized that not all evidence "is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." Id. at 487-88. Instead of applying a strict "but for" causation standard, the question was whether the evidence was obtained " 'by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " Id. (quoting JOHN MACARTHUR MAGUIRE, EVIDENCE OF GUILT: RESTRICTIONS UPON ITS DISCOVERY OR COMPULSORY DISCLOSURE 221 (1959)). Mayfield cited Wong Sun as exemplifying the appropriately "narrow exception" to the exclusionary rule, and as consistent with Washington state constitutional law. 192 Wn.2d at 893, 897-98.

Most recently, in McGee, the Supreme Court favorably cited State v. Childress, 35 Wn. App. 314, 666 P.2d 941 (1983), and People v. McInnis, 6 Cal. 3d 821, 494 P.2d 690, 100 Cal. Rptr. 618 (1972), as cases where an independent act of free will satisfied the attenuation doctrine. 3 Wn.3d at 868, 872-73. In Childress, police in California conducted an illegal search and discovered the defendant's Washington driver's license, a bank check showing an Everett address, and a photograph of two nude girls. 35 Wn. App. at 315. California officers forwarded the information to Everett police, who canvassed the neighborhood and located the parents of one of the girls in the photograph. Id. The parents made a general, nonsuggestive inquiry of their daughter, who

13

disclosed sexual involvement with the defendant. Id. at 315-16. The court looked to factors the United States Supreme Court had identified as particularly relevant when applying the exclusionary rule to witness testimony: (1) the length of the "road" between the unlawful police conduct and the witness's testimony, (2) the degree of free will the witness exercised, and (3) whether exclusion would permanently disable the witness from testifying about relevant and material facts, even though the testimony might be unrelated to the original illegal search's purpose or the evidence discovered during it. Id. at 316 (citing United States v. Ceccolini, 435 U.S. 268, 275-77, 98 S. Ct. 1054, 1060, 55 L. Ed. 2d 268 (1978)). Under the attenuation doctrine, the daughter's new, voluntary disclosure was the cause of the new discovery of her testimony. Id. at 317.

In McInnis, police identified the defendant as the perpetrator of a liquor store robbery by showing a witness a booking photo of the defendant from an illegal detention a month prior. 6 Cal. 3d at 823-24. The court admitted the witness's identification and the California Supreme Court affirmed, explaining that "[t]o hold that all such pictures resulting from illegal arrests are inadmissible forever . . . would not merely permit the criminal 'to go free because the constable has blundered' but would . . . in effect be giving [the defendant] a crime insurance policy." Id. at 826 (citation omitted) (quoting People v. Defore, 242 N.Y. 13, 21, 150 N.E. 585 (1926)). Our Supreme Court cited McInnis as consistent with the exclusionary rule under article I, section 7 because "[w]hile the photograph would

14

not be admissible, the witness's identification could be considered an independent act of free will and thus admissible." McGee, 3 Wn.3d at 873.[3]

Parker argues that Childress is no longer viable because it relied on Ceccolini, a Fourth Amendment case, and so potentially a standard that is less protective of privacy than Mayfield. Mayfield defines the attenuation doctrine as it was originally conceived to depend on a superseding cause. 192 Wn.2d at 883. Childress cited Ceccolini's discussion of the special considerations when applying the exclusionary rule to witness testimony. 35 Wn. App. at 316. We do not read Childress as also endorsing Ceccolini's reliance on the principle of deterring official misconduct underlying the exclusionary rule of the Fourth Amendment, see 435 U.S. at 279-80, which would be incompatible with article I, section 7. In finding attenuation, Childress rested on the witness's independent act of free will to make incriminating statements to her parents. The reasoning and outcome of Childress remain consistent with the Washington Supreme Court's decisions in both Mayfield and McGee.

The cases cited above suppressed testimonial evidence that police gained during the illegal entry and arrest of defendant Toy in Wong Sun, and evidence

---

[3] Other Washington courts have concluded that the testimony of a witness discovered through a constitutional violation was not subject to suppression. See State v. Russell, 125 Wn.2d 24, 57 n.9, 882 P.2d 747 (1994) (noting that "courts are more reluctant to exclude the testimony of other witnesses than they are physical evidence"); State v. Stone, 56 Wn. App. 153, 161-62, 782 P.2d 1093 (1989) (witness's testimony was sufficiently attenuated from police misconduct where she went to the sheriff's office voluntarily, affirmatively assisted officers in locating houses the defendant had burglarized, and "exercised her own free will both in her statements to police and in her testimony at trial"); State v. West, 49 Wn. App. 166, 168-71, 741 P.2d 563 (1987) (attenuation found where the witnesses' statements were "freely and voluntarily given").

they gained during and immediately because of an illegal seizure as in Mayfield. But the case law has distinguished evidence gained from a voluntary disclosure by the witness, including by the defendant, that is remote in impetus from police misconduct, as with defendant Wong Sun in that case, Childress, and McInnis. This is consistent with "Mayfield's language analogizing to tort law." McGee, 3 Wn.3d at 869. In this court's opinion in McGee, we explained that "[t]he 'theoretical underpinning of an intervening cause which is sufficient to break the original chain of causation [i.e., constitute a superseding cause] is the *absence of its foreseeability*.' " State v. McGee, 26 Wn. App. 2d 849, 858, 530 P.3d 211 (2023) (some alterations in original) (quoting Campbell v. ITE Imperial Corp., 107 Wn.2d 807, 813, 733 P.2d 969 (1987)), aff'd, 3 Wn.3d 855, 557 P.3d 688 (2024). This inquiry considers whether " 'the likelihood' " of the intervening act is " 'one of the hazards which makes the [defendant] negligent.' " Id. (alteration in original) (quoting Albertson v. State, 191 Wn. App. 284, 297, 361 P.3d 808 (2015)). The nonexclusive factors courts have used in addressing superseding cause in tort cases include whether the intervening act " 'created a *different type of harm* than otherwise would have resulted from the actor's negligence.' " Id. at 858 n.4 (quoting Campbell, 107 Wn.2d at 812-13). In requiring a superseding cause in the article I, section 7 context, the court demands an intervening circumstance bringing about a discovery beyond the foreseeable results of the police misconduct itself.

Here, that misconduct was using the CSS to gain a precise location for Parker's phone, going beyond the PRTT order, without having informed the magistrate that that technology would be used and obtaining authorization. D.B.'s

16

volunteering subsequent statements to law enforcement, later that day at her home, and weeks later, at her own election to share her testimony, are intervening circumstances going beyond the foreseeable results of the police using the CSS without permission to locate Parker's phone. Unlike in Mayfield, D.B. was not the defendant, nor a suspect, and was both free to reflect on her options and free to leave the scene after the initial stop.[4] D.B. agreed to speak with officers at a separate location and after time had passed from the stop. The period of time was even longer between the first interview on January 6 and the subsequent interview on January 22 when D.B. provided most of the incriminating information about Parker and A.W. Like in Childress, where a third party's voluntary disclosure to officers was the superseding cause between the initial police misconduct and the challenged testimony, D.B.'s voluntary disclosure was the superseding cause of the discovery of her testimony. The trial court did not err in concluding that D.B.'s testimony was attenuated from the police misconduct and was admissible.

III

Parker argues he is entitled to resentencing because his sentence was imposed using an offender score that included a conviction invalid under Blake. Because Parker's standard sentencing range does not change and we can discern from the record that his sentence would not change, we disagree.

---

[4] Parker suggests that Detective Quilio's possession of D.B.'s gun coerced D.B. to cooperate in the investigation. This argument is not supported by testimony in the suppression hearing.

17

As an initial matter, the parties dispute whether this issue is before the court on direct review or as a collateral attack.[5] " '[A] new rule for the conduct of criminal prosecutions is to be applied . . . to all cases, state or federal, pending on direct review or not yet final.' " State v. Wences, 189 Wn.2d 675, 677, 406 P.3d 267 (2017) (second alteration in original) (quoting In re Pers. Restraint of St. Pierre, 118 Wn.2d 321, 326, 823 P.2d 492 (1992)). " 'Final' " means " 'a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.' " St. Pierre, 118 Wn.2d at 327 (quoting Griffith v. Kentucky, 479 U.S. 314, 321 n.6, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987)). Additionally, "a final judgment 'ends the litigation, leaving nothing for the court to do but execute the judgment.' " State v. Taylor, 150 Wn.2d 599, 601, 80 P.3d 605 (2003) (internal quotation marks omitted) (quoting In re Det. of Petersen, 138 Wn.2d 70, 88, 980 P.2d 1204 (1999)). A conviction is "final" for personal restraint petition time-bar purposes only if both the conviction and the sentence are final. In re Pers. Restraint of Skylstad 160 Wn.2d 944, 953-54, 162 P.3d 413 (2007).

Under State v. Kilgore, finality occurs when "the 'availability of appeal' [has] been exhausted." 167 Wn.2d 28, 43, 216 P.3d 393 (2009) (emphasis omitted)

---

[5] The State also argues that Parker did not timely appeal the order denying the Blake resentencing in violation of RAP 2.5 and 5.3. In his notice of appeal, Parker sought review of "the denial of post-appeal 3.6 motion, judgment and sentence rendered against him on the 27th day of January 2023." The order denying relief pursuant to Blake was filed on January 27, 2023. Additionally, the order denying relief pursuant to Blake was attached to Parker's notice of appeal, and both were filed on the same day. We conclude Parker has adequately designated the order in his notice of appeal.

18

(quoting St. Pierre, 118 Wn.2d at 327). "[A] case has no remaining appealable issues"—for instance—"where an appellate court issues a mandate reversing one or more counts and affirming the remaining count, and where the trial court exercises no discretion on remand as to the remaining final count." Id. at 37. In Kilgore, the court noted that "[a]lthough the trial court had discretion . . . to revisit Kilgore's exceptional sentence on the remaining five convictions, it made clear that . . . it was not reconsidering the exceptional sentence imposed on each of the remaining counts." Id. at 41. Thus, because the trial court chose not to exercise its discretion on remand, finality occurred when the Supreme Court issued its mandate terminating Kilgore's right to appeal in state court. Id. at 44. In contrast, in State v. Brown, where the trial court did exercise discretion on remand to determine whether an exceptional sentence was appropriate, the issue was not final for purposes of reviewability. 193 Wn.2d 280, 287, 440 P.3d 962 (2019).

Here, this court remanded for the trial court to conduct a suppression hearing to determine whether D.B.'s testimony was attenuated from police misconduct and whether Parker's convictions stood. Parker, No. 82049-4-I, slip op. at 2, 17. The trial court exercised its discretion in deciding the suppression hearing, appealable issues remained, and Parker's convictions were not final. Because Parker's convictions were not final, Blake applies on direct review.

Blake held that Washington's strict liability drug possession statute, RCW 69.50.4013(1), violates state and federal due process clauses and therefore is void. 197 Wn.2d at 195. A conviction based on an unconstitutional statute cannot be considered in calculating an offender score. See State v. Ammons, 105 Wn.2d

19

175, 187-88, 713 P.2d 719, 718 P.2d 796 (1986).  Thus, Parker's offender score in his 2018 judgment and sentence was incorrect.

"When the sentencing court incorrectly calculates the standard range . . . remand is the remedy unless the record clearly indicates the sentencing court would have imposed the same sentence anyway."  State v. Parker, 132 Wn.2d 182, 189, 937 P.2d 575 (1997).  This court has held that where the standard sentence range is the same after recalculation of the offender score, a calculation error may be harmless.  State v. Priest, 147 Wn. App. 662, 673, 196 P.3d 763 (2008).  However, even if the sentencing range is the same, the error is not harmless if the "record does not clearly indicate that the sentencing court would have imposed the same sentence" without the erroneous offender score.  State v. McCorkle, 88 Wn. App. 485, 499-500, 945 P.2d 736 (1997), aff'd, 137 Wn.2d 490, 973 P.2d 461 (1999).

Here, Parker's miscalculated offender score was 12.  Without the Blake conviction, Parker's offender score would still be above 9.  Once a defendant's offender score reaches 9 and above, the standard range sentence remains the same.  State v. Kelly, 4 Wn.3d 170, 183 n.9, 561 P.3d 246 (2024).  In ruling on Parker's CrR 7.8 motion, the trial court stated that "the reduction of the score by one point because of prior drug possession/conviction doesn't affect the outcome of the sentence at all," and "I can tell you as a sentencing judge, [the sentence] would not have been any different at all.  [The prior drug conviction] had nothing to do with it."  Because it is clear from the record that the trial court would have

imposed the same sentence even without the offender score error, Parker is not entitled to resentencing.[6]

IV

Parker argues we should strike the victim penalty assessment fee. However, on November 16, 2023, the trial court waived Parker's legal financial obligations that were not restitution, including the victim penalty assessment fee. Thus, this claim is moot. In re Det. of J.S., 138 Wn. App. 882, 889, 159 P.3d 435 (2007) ("An issue is moot when a court can no longer provide meaningful relief.").

Parker further argues that we should strike the community custody condition requiring that he pay his supervision costs. The State does not object to striking the community supervision fee. We accept the State's concession and remand for the trial court to strike imposition of the community custody supervision fee as a ministerial matter. We otherwise affirm.

_Birk, J._

WE CONCUR:

_Chung, J._          _Mann, J._

---

[6] Because we conclude that Parker is not entitled to resentencing, we do not address Parker's argument that remand should occur before a different judge.